PHILIP D. ARMOUR ET AL.

v.

JAMES McFADDEN

1. NEGLIGENCE.—The testimony showing conclusively that appellee had knowledge of the hatchway where he was injured, and that he was not exercising due care at the time the injury occurred, the judgment is reversed.

2. VERDICT CONTRARY TO EVIDENCE.—While it is true that it is the province of a jury to decide upon contested questions of fact, and where there is a mere preponderance of testimony, their verdict will not be disturbed, yet when the verdict is manifestly contrary to the evidence, evincing passion, prejudice or undue influence, it is the duty of a court to set it aside.

APPEAL from the Circuit Court of Cook county; the Hon. JOHN G. ROGERS, Judge, presiding. Opinion filed November 29, 1881.

Mr. EMERY A. STORRS, for appellants; that no recovery by a servant can be had against a master for an injury occasioned by a fellow servant, cited C. C. & S. C. R. R. Co. v. Troesch, 68 Ill. 545; Ill. Cent. R. R. Co. v. Cox, 21 Ill. 20; C. & A. R.

R. Co. v. Keefe, 47 Ill. 108; C. & A. R. R. Co. v. Murphy, 53 Ill. 336; Ill. Cent. R. R. Co. v. Gregory, 58 Ill. 272; C. & N. W. R. R. Co. v. Moranda, 93 Ill. 302; Vadez v. D. M. R. R. Co. 85 Ill. 500; C. &. A. R. R. Co. v. Rush, 84 Ill. 570.

Plaintiff cannot recover when he has been guilty of negligence, unless such negligence was slight and that of defendant's gross in comparison: Ill. Cent. R. R. Co. v. Hammer, 72 Ill. 347; C. B. & Q. R. R. Co. v. Harwood, 90 Ill. 425; I. & St. L. R. R. Co. v. Evans, 88 Ill. 63; Schmidt v. C. & A. R. R. Co. 83 Ill. 435.

Mr. John Lyle King, for appellee; as to the liability of appellants by reason of their negligence, cited 2 Thompson on Negligence, 981; Cayzer v. Taylor, 10 Gray, 274.

Where the testimony is conflicting, the verdict will not be disturbed: Wilson v. Bevans, 53 Ill. 252; Robinson v. Parish, 62 Ill. 130; Calver v. Carpenter, 96 Ill. 63.

Wilson, P. J. As there are no disputed questions of law in this case, we shall do little more than state the conclusions of fact at which we have arrived upon a consideration of the evidence. Appellants were the proprietors of a packing house at the Union Stock Yards, and engaged in the business of pork packing. At the time of the injury complained of, appellee was, and for several years next preceding had been, in their employ as foreman of the cooperage department, having the general supervision and charge of all barrels received into the establishment.

When barrels had been packed they were left by the packers on the first floor of the packing house, where they were examined by appellee, and thence conveyed to the basement below, sometimes by an elevator and sometimes by a skid or slide, through a hatchway situated near the middle of the room. Through this hatchway, appellee, while engaged in his usual business, fell and received the injury, to recover damages for which this suit was brought.

The declaration alleges that the defendants wrongfully and negligently suffered and permitted said hatchway to be and remain open and uncovered, and without any guard or protec-

tion, or signal at or near the same, so that for want of the same and in consequence thereof, "the plaintiff, who was then and there ignorant of the existence of said hatchway, and was then and there passing over and on the said floor of said building on a lawful occasion, and in the exercise of proper and reasonable care, then and there necessarily and unavoidably fell in said hatchway and on to the floor below, whereby he was injured, etc."

Under the allegations in the declaration, it was requisite to a right of recovery that it should be shown, first, that the defendants were guilty of negligence, and secondly, that the plaintiff was in the exercise of reasonable care and caution at the time of the injury. Under the view we take of the case, it becomes unnecessary to consider the question as to the alleged negligence of the defendants, it not being claimed, and there being no ground for claiming, as we think, under the evidence, that the defendants were guilty of wanton or willful negligence. For if it be conceded that the defendants might, by placing stationery barriers around the hatchway, have rendered it a place of less danger, it does not follow that they are therefore liable, if the plaintiff knew of its existence, and might by the exercise of proper and reasonable care have avoided it. The rule of law in relation to contributory negligence is too familiar to need repetition, or require the citation of authorities.

The questions of fact presented are, first, was there, to the knowledge of appellee, a hatchway which was at times open and in use; and secondly, if there was, is appellee chargeable with carelessness in having walked into it?

Appellee testified that he was wholly ignorant of the hatchway until he fell into it; that he never knew of its existence before, and never knew of barrels being skidded down there. In view of the fact that appellee had been constantly in and about the room for several years next preceding the accident, overseeing and directing the men under his control while at work, and especially in view of the testimony of the other witnesses, this statement seems somewhat extraordinary. He is contradicted by several of his own witnesses, and by all of ap-

pellant's witnesses, who testified on that subject. It is shown by many witnesses that not only was he aware of the existence of the hatchway, and of its repeated use in skidding barrels into the basement, but that when complaints were made to him that some of the barrels leaked and were dry, he attributed it to their being injured by wrongly constructed skids; and that after the boss carpenter had caused a new one to be supplied, appellee inspected its workings in company with the carpenter, saw them sliding down barrels on it, and pronounced it a great improvement over those before used. This is proven, not by one witness, but by many. Francis McCrary testified that the hatchway had been used for skidding barrels into the basement, from the commencement of the season that year, every day continuously, down to the time of the accident, and on that day it was used from seven o'clock in the morning to the time of the injury. He further testified that appellee's business called him on to that floor as much as his did; that he talked with appellee about the injury done to the barrels, and appellee said it was caused by improperly constructed skids; that after a new one was put in, he took appellee to the basement to show it to him, and that they stood there and saw barrels come down.

Frank Burness, the carpenter, testified that he had known the hatchway since the house was built in 1871; that he made the new skid, and after it was placed in position and tested, he had a talk with appellee about it; that appellee was complaining all the time of the cooperage getting hurt coming down on the other skid, and said that the new skid was a great deal better, and did not hurt the barrels half as bad as the old one.

James Halpin testified that he was at work there on the day of the accident; that the hatchway had been in use before every day; that they were letting down barrels and they used lamps in the cellar below.

John Kelly testified that the hatchway had been used frequently before the day of the accident, and that he had seen appellee about the floor when the hatchway was open and in use. He further testifies that he heard a conversation between appellee and McCrary about the skids sometime previous to

the accident; that McCrary was showing him the skids, and appellee seemed to approve of the new skid; said it was a good way, as it would protect the hoops of barrels; that the hatchway was open at the time, and they were then rolling down barrels.

Thomas Emberson, the defendant's timekeeper, says: "I knew McFadden before the time of the injury had notice of the use to which the hatchway was put. I was going through the cellar taking time, and I saw him with a man they call McCrary; he is one of the foremen there, looking at the thing, and they put down some barrels, to show him how they came down. Looking at the skid, I heard him remark it was the only decent job he had seen around the packing house.

Mr. Cudahy, one of the proprietors, testifies that the hatchway had been used for skidding barrels before the accident occurred, every day, for several days; that it was the most convenient way of letting down barrels, etc.

Owen Woods, a witness for appellee, testified that he had known of the hatchway ever since he worked at appellant's packing house, and assisted in lowering barrels through it; that it was used for that purpose before the accident nearly every day.

Charles Murphy, another of appellee's witnesses, testifies that they were skidding down barrels a day or two before the accident.

Patrick McCabe, still another of his witnesses, testifies that they were letting down pork through the hatchway, the day before the accident, and that the hatchway was guarded on three sides, as on the day of the accident.

Now unless these witnesses have sworn falsely, appellee knew of the existence of the hatchway, and that it was often in use. With a single exception, all the witnesses who testified on that subject were fellow-laborers and co-employes with appellee. All of them had the same, but no better opportunities, for knowing the condition of things that he had, and all of them testify to having known of the existence of the hatchway, and of its frequent use. So far as appears, these witnesses were credible men, and we think their testimony,

Armour v. McFadden.

tiken together, is overwhelming, showing beyond peradventure, that appellee either intentionally falsified, or was very greatly mistaken, when he denied all knowledge of the hatchway prior to the time of the accident. It is unnecessary to characterize his denial as perjury, but it unavoidably lessens the reliance to be placed on other portions of his evidence.

Was appellee in the exercise of due care, at the time of the accident?

On the day of the occurrence the hatchway was in use during the forenoon, and down to a time shortly before the injury. It was protected on three sides by barrels placed on end, the fourth side being left open for the reception of barrels onto the skid. Men were employed on the basement floor receiving barrels, as they were skidded down, and others were engaged on the upper floor bringing barrels to the hatchway to be skidded down. Appellee, while engaged in his usual business, and about to show one of his men where to place some barrels at a point beyond the hatchway, was walking across the floor, and, when the hatchway at the moment was not actually in use, stepped into its unguarded side, and fell to the floor below, causing the injury complained of. The proof shows that it was a bright, clear day, and that the room was lighted by seventeen windows. Appellee however swears that the windows were darkened by the shutters being closed. He is the only witness who testifies that the shutters were closed. On the other hand, one of the proprietors, the carpenter who had long been employed in the building, and others, testify that not only were the shutters not closed, but that there were no shutters to the building. Appellee further swears that there was a partition for a meat market on one side of the room, running up to the ceiling, which closed out all the light from that quarter. In this he is again contradicted by several witnesses, and among them the carpenter, all of whom testify that prior to, and at the time of the accident, there was no such partition; that the only partition there was, was a small rail in front of the meat market, about the height of a table; that it did not reach as high as the windows, and did not obstruct the light at all, and was put there merely to prevent the men

when rolling in barrels, from rolling them against customers at the market. No room is thus left for doubt, that in respect to the shutters and the partition, appellee testified untruthfully.

The account he gives of the circumstances immediately attending the transaction, is that one of his men had misunderstood his instructions about the place to stow certain barrels, and 'that while passing along the floor to show him the proper place, the man following him, he walked into the opening; that he was not saying anything; that he did not see anything; that it was "darkened down," and he could not see anything from the lights in the basement.

According to all the witnesses, the hatchway was enclosed on three sides by barrels standing on end, and assuming, as we must under the evidence, that they could readily be seen, it seems difficult to account for his failure to go around them, instead of walking directly towards them and into the hatchway, upon any other hypothesis than that when he fell in he was looking in some other direction, or that, for some reason his mind was so much absorbed at the moment, as that he did not notice the direction he was taking. As there was, so far as appears, no obstruction to a passage around these standing barrels, either hypothesis would be reasonable in the absence of any explanatory evidence.

But there is evidence, which we think, furnishes the true explanation. Hugh Matear testifies that he was standing 15 or 20 feet from the hatchway, and saw appellee as he was walking towards it. He says: "appellee was talking to some of his men behind him, and his head was turned away from the hatchway. He was not looking in the direction he was walking." If this were the only evidence contradictory of appellee, it might properly be regarded as only oath against oath, but when taken in connection with the account of the occurrence given by appellee himself, while testifying on a former trial, the conclusion seems unavoidable that appellee's testimony on this trial, cannot be accepted as truthful.

On the former trial he said: " McCabe misunderstood me, and he came back and asked me again. I got mad at him, and walked right quick along the floor *while I was talking to him*, paying attention to my business. I never thought or

Armour v. McFadden.

knowed anything about the hatchway was open, and the first I knowed I went right in." Q. "You walked fast?" A. "Of course I did, and talked to him all the time." When this testimony was given, the facts presumably were fresher in appellee's mind than at the last trial, and his statements were substantially alike upon the direct and cross-examination. The account of the transaction, as given by Matear and by appellee on the former trial, afford a natural and reasonable solution of the cause of the accident. Impatient with, and talking to his subordinate, as he was passing along, with his face turned away from the direction in which he was going, he neither saw nor thought of the hatchway. He walked into it without the observance of due caution—indeed, without any caution. The allegation in his declaration is that he was in the exercise of proper and reasonable care. This we think he wholly failed to prove, but that the contrary is clearly shown.

It is urged that, as it was wholly a question of fact upon which the jury have passed, the court should not interfere. If it were the case of a mere preponderance of evidence, we should agree with the learned counsel for appellee. It is the settled rule that in such cases the court will not disturb the finding of the jury. But the rule is equally well settled in this State, that where the verdict is manifestly contrary to the evidence, evincing prejudice, passion or other undue influence, it is the duty of the court to set it aside. A supervisory power over the verdicts of juries is one of the highest and often most useful and necessary functions of judicial tribunals. But for its exercise the grossest injustice might be done in given cases through the prejudice, ignorance, caprice or undue sympathy of a jury. In the present case the jury awarded damages to the amount of $5,000, of which the court below required the plaintiff to remit three-fifths. We are constrained to believe, not so much from the amount of damages awarded as from the finding the issues for the plaintiff under the evidence, that the jury were unduly influenced by sympathy for the plaintiff's misfortune.

The judgment must be reversed and the cause be remanded for a new trial.

Reversed and remanded.